Ellyn S. Garofalo (SBN 158795)
egarofalo@linerlaw.com
Amir Kaltgrad (SBN 252399)
akaltgrad@linerlaw.com
LINER LLP
1100 Glendon Avenue, 14th Floor
Los Angeles, California 90024.3518
Telephone: (310) 500-3500
Facsimile: (310) 500-3501

Attorneys for Plaintiff
WEBSPECTATOR CORPORATION, a Delaware corporation

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| WEBSPECTATOR CORPORATION, a Delaware corporation<br><br>Plaintiff,<br><br>vs.<br><br>ANDRÉ TOMAS DA SILVA PEREIRA NASCIMENTO PARREIRA, an individual; DULCE CATARINA PARREIRA, an individual; RAFAEL MORA FUNES, an individual; WEBSPECTATOR, LDA, a Portuguese Limited Company; and DOES 1 – 10; inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) Violation of the Anti-Cybersquatting Consumer Protection Act – 15 U.S.C. § 1125(d)**<br><br>**(2) Violation of the Computer Fraud and Abuse Act – 18 U.S.C. § 1030(g)**<br><br>**DEMAND FOR JURY TRIAL** |

For its Complaint, Plaintiff Webspectator Corporation alleges as follows.

## I. INTRODUCTION

1. This is a case of cyber piracy orchestrated by ousted officers and directors of Plaintiff Webspectator Corporation ("Plaintiff", "Webspectator Corporation" or the "Company"). Webspectator Corporation is a well-established and highly successful Internet service that offers sophisticated digital advertising tools to Fortune 500 companies and major Internet publishers such as Time, Inc., Forbes, NY Daily News, Scripps and many others. Since its 2012 founding, the Company has been a pioneer in time and attention digital advertising, offering services that have generated millions of dollars in increased revenues for its clients. By 2015, Webspectator Corporation was generating approximately $8 million in revenue, with a projected run rate of $15 million for 2016.

2. Defendants Andre Tomas Da Silva Pereira Nascimento Parreira ("A. Parreira"), Dulce Catarina Parreira ("D. Parreira") and Rafael Mora Funes (collectively, the "Ousted Board Defendants") did not leave Webspectator Corporation empty handed. On their way out the door, they seized Webspectator Corporation 's passwords, user names, trademark and domain to effectively disconnect Webspectator from its own website, technology, clients and revenue and freeze the Company out of its own business.

3. The poached passwords, usernames and trademarked domain, have given the Ousted Board Defendants unfettered and unauthorized access to the Company's technology that resides on its Amazon Web Services and the Company's back office system. The Ousted Board Defendants have used this access to choke off the Company's revenue stream, and redirect payments destined for Company accounts to off shore entities and accounts personally owned by the Ousted Board Defendants. Its revenue having been cut-off, Webspectator Corporation is not receiving the monies it is obligated to pay to its publisher clients, jeopardizing its relationships with the clients who are the lifeblood of the Company.

LINER LLP | 1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

4. If this were not enough, the Ousted Board Defendants have created off shore entities disguised as Webspectator Corporation in an effort to shift the accounts of unsuspecting Webspectator Corporation clients to the new shadow entities.

5. As a result of the conduct of the Ousted Board Defendants, Webspectator Corporation 's ability to conduct business has been crippled and it is unable even to access its own links to its customers or use its own emails addresses.

6. By this Complaint, Plaintiff seeks to enjoin Defendants from any further access to, or exploitation of, Plaintiff's technology and to recover its trademark, domain and operating system so that it can resume its business. Plaintiff also seeks damages for substantial financial harm that Defendants' misconduct has wreaked on the Company.

## II. <u>THE PARTIES</u>

7. Plaintiff Webspectator Corporation ("Plaintiff", "Webspectator Corporation" or the "Company") is, and at all times relevant hereto was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Los Angeles, California.

8. Plaintiff is informed and believes, on based thereon alleges, that Defendant Andre Tomas da Silva Pereira Nascimento Parreira ("A. Parreira") is, and at all time relevant hereto was, a citizen of Portugal, residing in the State of California, County of Los Angeles.

9. Plaintiff is informed and believes, on based thereon alleges, that Defendant Dulce Catarina Parreira ("D. Parreira") is, and at all times relevant hereto was, a citizen of Portugal, residing in the State of California, County of Los Angeles.

10. A. Parreira and D. Parreira are collectively referred to as "the Parreiras."

11. Plaintiff is informed and believes, and based thereon alleges, that

Defendant Rafael Mora Funes ("Mora") is, and at all times relevant hereto was, a citizen of Portugal, previously residing in Brazil and now is believed to be residing in Portugal.

12. Plaintiff is informed and believes, on based thereon alleges, that Defendant Webspectator Lda. Is, and at all times relevant hereto was, a Portuguese Limited Company organized and existing under the laws of Portugal. Plaintiff is informed and believes, and based thereon alleges that the Ousted Board Defendants are Webspectator Lda.'s principals and control Webspectator Lda.

13. The Ousted Board Defendants and Webspectator Lda. Are collectively referred to as "Defendants."

14. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1-10 inclusive, and therefore sues these defendants by such fictitious names pursuant to Code of Civil Procedure § 474. Plaintiff will amend the complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's losses as herein alleged were proximately caused by each of them.

15. Plaintiff is informed and believes, and based thereon alleges, that except as otherwise alleged, each Defendant, including DOES 1 through 10, inclusive, is, and at all relevant times was, the agent, servant, employee, partner, joint venturer, subsidiary or affiliate of each of the other Defendants and, in doing the things alleged herein, was acting within the course and scope of such position with the permission, knowledge and consent of each of the other Defendants, and that the other Defendants directed and ordered the action beforehand, or alternatively, subsequently ratified and approved the conduct of the other Defendants.

## III. <u>JURISDICTION AND VENUE</u>

16. This Court has jurisdiction over the claims alleged herein pursuant to

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

28 U.S.C. §§ 1331 and 1338 because the controversy involves a federal question, arising under the laws of the United States and arises under an Act of Congress relating to trademarks.

17. Venue is proper within this judicial district under 28 U.S.C. § 1391 because a substantial part of the property that is the subject of the action is situated in the Central District of California and the Parreiras reside in Los Angeles, California.

## IV. ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

18. Webspectator Corporation was organized to conduct a digital advertising business using innovative new technology developed by engineers at Internet Business Technologies, SA., a holding company for a family of related entities including IBT Portugal, IBT Brazil and IBT USA (collectively,"IBT").

19. On December 6, 2011, IBT applied to the USPTO for the "WEBSPECTATOR" trademark.

20. Once IBT's technology was operational, IBT intended to spin off its digital advertising business and capabilities to a new entity in the United States.

21. Accordingly, on March 2, 2012, IBT organized Webspectator Corporation as a Delaware corporation. IBT vested Webspectator Corporation with the exclusive right to use IBT's technology for digital advertising in exchange for a licensing fee paid to IBT. In this vein, on July 19, 2013, IBT assigned "the entire interest and the goodwill" in the Webspectator trademark to Webspectator Corporation.

22. On February 4, 2014, the mark was registered to Webspectator Corporation. Webspectator Corporation has owned the mark continuously since.

23. The Webspectator Corporation domain, Webspectator.com which incorporates the Webspectator Corporation trademark, followed a similar pattern. On or about December 2, 2011, an IBT subsidiary registered Webspectator.com through registrar godaddy.com. Mr. Parreira was identified as IBT's "Admin" and

LINER LLP 1100 Glendon Avenue | 14th Floor Los Angeles, CA 90024.3518

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

"Tech" contact.

24. The registration was changed prior to August 1, 2013, with Mr. Parreira, an IBT employee, as the Registrant and IBT as the Registrant Organization.

25. By November 8, 2015, Webspectator Corporation had replaced IBT as the Registrant Organization. The Registration included Webspectator Corporation's Santa Monica office address and telephone number.

26. According to a domain report obtained from DomainTools, LLC, as late as May 3, 2016, Webspectator Corporation remained the Registrant Organization, for Webspectator.com.

27. Webspectator Corporation's clients are large, prestigious publishers of internet advertising such as Time Inc., Forbes, Scripps and The New York Daily News. The identification of a target demographic is crucial to effective internet advertising. Publishers are paid for each view of the advertisement. The industry standard business model is that advertisers pay $1 to $2 per thousand impressions on viewer screens. An impression is defined by the IAB (Internet Advertising Bureau, the digital ad industry association) for any view in which the 50% of the ad stays on a viewer's screen for 1 second.

28. By installing Webspectator Corporation's technology, a publisher can verify in real time, that 100% of an ad is being viewed by a targeted viewer for 20 seconds – far better than the industry standard. This real time information permits the publisher to increase their ad inventory and revenue by quickly placing additional ads on the website it now knows is holding the attention of the viewer that the advertiser seeks to reach. The technology not only increases the number of ads sold by the publisher, but also enables the publisher to charge more than the industry standard for an ad verified to have stayed on the screen for at least 20 seconds, rather than one second.

29. The Webspectator Corporation domain is the mechanism through

which the Webspectator Corporation software interacts with the customers "back office" and ad serving systems. It is also the public face of the website, and controls all @Webspectator.com email addresses.

30. Webspectator Corporation has been accredited and rated by Media Rating Council, Inc. ("MRC"), an independent organization originally created by the United States Congress. Accreditation allows Webspectator Corporation to display the MRC Accreditation logo on its website which validates the reliability of Webspectator Corporation and its technology.

31. Golden Edge Luxembourg S.A.R.L. and RS HoldingsS.G.P.S., S.A. are Webspectator Corporation's majority shareholders (the "Majority"). In spinning off its digital advertising technology to Webspectator Corporation, the Majority made the fatal decision to entrust Webspectator Corporation and its valuable trademark, technology and business to the Ousted Board Defendants. Mr. Parreira became WebSpecator's Chief Executive Officer, Ms. Parreira the Chief Financial Officer, and all Ousted Board Defendants were given seats on the three member Webspectator Board.

32. Allowing the Ousted Board Defendants to control Webspectator Corporation, was akin to inviting the fox into the henhouse.

33. By mid to late 2015, evidence began to surface of self-dealing and diversion of Company assets by the avaricious Parreiras. Among other things, it came to light that the Parreiras were using Company funds to pay their personal expenses including their home, automobiles and lavish lifestyle.

34. When confronted, the Parreiras conceived a scheme to seize the Company's passwords and user names, and secretly transfer the Company's trademark, technology, operational capabilities and revenues to off shore entities posing as "Webspectator", but controlled by the Parreiras.

35. On December 16, 2015, Mr. Parreira promulgated a Board "Resolution" that purportedly "authorized" the transfer of Webspectator

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

Corporation's name and trademarks to Brazilian and Portuguese entities, including Webspectator Lda, owned in the Ousted Board Defendants' personal names.

36. The Resolution falsely states that Webspectator Corporation would own 99% of the new off shore entities – giving the false impression that Webspectator Corporation was merely shifting its operations off shore. In fact, the Parreiras had no intention of ceding 99% of the entities organized in their names to Webspectator Corporation or any other entity under the IBT umbrella. These entities remain under the Parreiras' control instead of the rightful owner, Webspectator Corporation.

37. On July 7, 2016, the Majority executed Consents ousting the Ousted Board Defendants from the Webspectator Corporation Board. By August 24, 2016, the Ousted Board Defendants had removed the domain's "registrant organization" (i.e. Webspectator Corporation), although the "Admin Organization" and "Tech Organization" were still identified as Webspectator Corporation and the registrant's contact information still reflected the address and phone number of the Webspectator Corporation office in Santa Monica.

38. The Ousted Board Defendants continued to resist efforts to remove them from the Board, sparking a protracted battle for control in the Delaware Chancery Court. The Court initially entered a stay to maintain the status quo – an order that unfortunately allowed the Ousted Board Defendants to maintain control and accelerate their scheme to hijack Webspectator Corporation's technology and business.

39. At some point between August 24, 2016 and January 28, 2017 – likely while the Court ordered stay was in effect – the Parreiras changed the domain Registrant's address from Santa Monica to an address in Portugal. The registrant's phone number was changed to Mr. Parreira's cell phone number and the registrant's email address was changed from dns@Webspectator.com to andretparreira@gmail.com. The "Admin Organization" and "Tech Organization"

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

were removed entirely. Neither Webspectator Corporation nor IBT shareholders were apprised of, much less approved, these changes.

40. Having exploited the Court-ordered stay to transfer the Company's assets to shadow, off shore "Webspectator" entities, in late February or early March 2017, the Ousted Board Defendants purported to resign from the Webspectator Corporation Board.

41. On April 18, 2017, the Delaware Court validated the Consents removing the Ousted Board Defendants, clearing the way for a new Board to take control.

42. The new Board immediately removed all of the current officers, including the Parreiras. This did not stop the Ousted Board Defendants from taking the final steps necessary to transfer Webspectator Corporations's assets, revenues and business opportunities to the Ousted Board Defendants' off shore entities, leaving the new Board with nothing but a shell.

43. By May 6, 2017, the Registrant for the Webspectator Corporation domain was identified as Domains By Proxy, LLC with an Arizona address and phone number. The registrant's email was changed to Webspectator.com@domainsbyproxy.com.

44. On May 11, 2017, A. Parreira attempted to register Webspectator Corporation software systems as well as Trugaze, and Adcell, new entities under the Ousted Board Defendants' control, with ASSOFT, a Portuguese software association that maintains a registry of software evidencing ownership and copyrights. In light of the dispute between the Ousted Board Defendants and Webspectator, ASSOFT placed A. Parreira's application for Webspectator in "suspension mode" pending further information.

45. The Ousted Board Defendants have now diverted the Company's revenues to foreign accounts under their control, including Webspectator Lda.

46. Ads placed for Webspectator Corporation's premium publisher clients

LINER LLP 1100 Glendon Avenue | 14th Floor Los Angeles, CA 90024.3518

are sold by “marketplaces,” such as OpenX, SOVRN, Rubicon, Komoona. Webspectator Corporation collects payments from the marketplaces and remits approximately 75% to its publisher clients, retaining the balance as its fee.

47. Through various means, including the altering of account names and passwords, the Parreiras have redirected payments from the marketplaces away from Webspectator Corporation to themselves. For instance, the Parreiras changed the SOVRN account name from Webspectator Corporation to Webspectator Lda. The Parreiras used a Company password to alter the wire instructions to channel payments from SOVRN (and other “marketplaces”) from Webspectator Corporation’s Citibank account to a “Webspectator Lda” account in Portugal.

48. For the period between September 2016 and the present, Plaintiffs have calculated over $600,000 that has been diverted from SOVRN to the Ousted Board Defendants’ off shore account. This is only one of multiple marketplaces that have been deceived into paying Webspectator Lda, instead of the legitimate payee, Webspectator Corporation.

49. As a result of the Ousted Board Defendants’ diversion of payments from marketers, Webspectator Corporation’s revenue has been cut-off, not only leaving Webspecator Corporation without income, but depriving it of the funds necessary to pay its publisher client under the Webspectator Corporation Standard Marketing Agreements.

50. Even though Webspectator Corporation is not receiving payments from the marketplaces, it remains responsible for paying the substantial sums owed to its publishers.

51. Webspectator Corporation is now receiving escalating complaints from large publishers such as the New York Daily News, ABCNEWS and many other about the overdue advertising payments. These are not the only problems caused by the Ousted Board Defendants’ conduct. For instance, on May 9, 2017, Webspectator Corporation received notice that the placement of the MRC

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

accreditation logo did not comply with MRC policy and that MRC's attempts to resolve the issue with A. Perriera had been unsuccessful.

52. In mid-May 2017, Webspectator Corporation began receiving notices from publisher clients that their revenue streams had been shut off by Webspectator. Shutting off revenue streams can only be accomplished with access to the Webspectator Corporation "backoffice" system. Webspectator Corporation has not been able to reestablish revenue streams for its clients because it is unable to access its own "backoffice" system.

53. Due to the Ousted Board Defendants' hijacking of the Webspectator.com domain, Webspectator Corporation is unable to access its own website in order to cure the defect, jeopardizing its MRC accreditation and/or right to display the MRC logo.

54. The Ousted Board Defendants have also removed, or blocked the Company's access to, its own financial records, including accounts payable and receivable. The Ousted Board Defendants are holding Company account numbers and login information associated with its "back office system" or its Amazon Web Services ("AWS") accounts hostage. The software and servers supporting Webspectator Corporation's products and services is housed in the "cloud" on servers rented from AWS.

55. Without access to AWS Accounts or the back office system, the Company cannot access the web-based platform that interacts with customer's websites or maintain or modify its own software. Although they have managed the Company since 2011, the Ousted Board Defendants claim they do not have the information. Instead, they contend the information is known only to third parties that Defendants have not identified.

56. In short, the Ousted Board Defendants have crippled Webspectator Corporation's ability to operate its business by hijacking, among other things, the Company's trademark, domain and technology; accessing Company computers

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

without authorization; diverting Company revenues to off shore accounts controlled by the Ousted Board Defendants.

**FIRST CLAIM FOR RELIEF**

**Violation of the Anti-Cybersquatting Consumer Protection Act – 15 U.S.C. § 1125(d)**

57. Plaintiff realleges and incorporates by reference paragraphs 1 through 56 of this Complaint as though fully set forth herein.

58. Webspectator Corporation has continually used the trademark "WEBSPECTATOR" ("Mark") in United States commerce since November 2013.

59. Webspectator Corporation is the owner of the Mark, which is valid and subsisting on the Principal Register in the United States Patent and Trademark Office, as follows:

| Mark | International Classes | Application Date | Registration Date | Registration Number |
|---|---|---|---|---|
| WEBSPECTATOR | 9,42 | 12/6/11 | 2/4/14 | 4,478,516 |

60. Webspectator Corporation has consistently and prominently displayed and advertised the Mark in connection with its products and services including its website www.Webspectator.com and company e-mail addresses each ending in @Webspectator.com. Webspectator Corporation has spent significant amounts of money promoting and advertising its Mark in connection with its products and services and has generated millions of dollars in revenue under its Mark.

61. As a result of Webspectator Corporation's extensive advertising and promotion under its Mark, the Mark has become distinctive. Accordingly, the Mark is an asset of incalculable value and an identifier of Webspectator Corporation and its high quality products, services and goodwill. To this end, Webspectator Corporation guards its intellectual property rights in the Mark.

62. Defendants have registered, trafficked in, and/or used a domain name

LINER LLP 1100 Glendon Avenue | 14th Floor Los Angeles, CA 90024.3518

that is identical or confusingly similar to the Webspectator Corporation mark, which was distinctive at the time A. Parreira transferred registration of the Webspectator.com domain to himself or registered the domain name.

63. Upon information and belief, Defendants have or had a bad-faith intent to profit from the Webspectator Corporation mark.

64. Defendants' use of the Webspectator.com domain has caused, and is likely to continue to cause, harm to Webspectator Corporation's good will and reputation.

65. Defendants' actions were willful, and Webspectator Corporation has no adequate remedy at law. Webspectator Corporation therefore seeks an Order from the Court transferring the Webspectator Corporation domain back to Webspectator Corporation .

66. Defendants' activities as alleged herein constitute a violation of the federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) entitling Plaintiff to preliminary and permanent injunctive relief.

67. As a proximate result of Defendants' willful and intentional actions, Webspectator Corporation has incurred attorneys' fees and costs.

68. As a proximate result of Defendants' willful and intentional actions, Webspectator Corporation has been damaged in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**

**Violation of the Computer Fraud and Abuse Act – 18 U.S.C. § 1030(g)**

69. Plaintiff realleges and incorporates by reference paragraphs 1 through 68 of this Complaint as though fully set forth herein.

70. Defendants have intentionally accessed a computer used in or affected interstate or foreign commerce or communication without authorization.

71. As a result of such conduct, Defendants recklessly caused a loss to Webspectator Corporation during a 1-year period aggregating at least $5,000 in value.

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

72. Defendants' activities as alleged herein constitute a violation of 18 U.S.C. § 1030(g).

73. Because of Defendants' willful and intentional actions, Webspectator Corporation has incurred attorneys' fees and costs.

74. Because of Defendants' willful and intentional actions, Webspectator Corporation has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully prays for judgment against the Defendants as follows:

**ON THE FIRST CLAIM FOR RELIEF:**

1. For an order permanently restraining and enjoining Defendants, their agents, servants, employees, and representatives, and all persons acting in concert or participating with them,

(a) From using the Webspectator Corporation trademark,

(b) From any use of, or access to, the Webspectator Corporation trademark, trademarked domain name or operating system,

(c) From taking any action that would directly or indirectly block or divert payments to Webspectator Corporation or its publisher clients for ads placed using the Webspectator Corporation technology, domain or trademark,

(d) From withholding user names and passwords necessary to access and use the domain Webspectator Corporation's back office system and Amazon Web Services,

I From withholding access and use of Webspectator.com domain from Plaintiff,

(f) From diverting, redirecting, interfering with and/or blocking the payment or transfer of any revenue generated by use of the Webspectator Corporation technology, Web Server, trademark or domain to Webspectator Corporation, owned and controlled by Plaintiff,

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

(g) From withholding from Webspecator Corporation any monies or payments generated by use of the Webspectator Corporation technology, Web Server, trademark or domain that were diverted, redirected or blocked by Defendants, or were received by Defendants or any entity or account they directly or indirectly own or control,

(h) From claiming any interest in funds collected or generated by SOVN prior to April 18, 2017.

(i) From in any way interfering with, disrupting or impeding the release of funds collected or generated by SOVERN, Open X, Rubicon, Komoona, or any other marketplace, prior to April 18, 2017.

2. For actual, compensatory and consequential damages in an amount to be proven at trial, but not less than $2,000,000.

**ON THE SECOND CLAIM FOR RELIEF:**

1. For actual, compensatory and consequential damages in an amount to be proven at trial, but not less than $2,000,000.

**ON ALL CLAIMS FOR RELIEF:**

1. For prejudgment interest;

2. For attorney's fees and costs of suit; and

3. For such other and further relief as the Court deems just and proper.

Dated: May 24, 2017 LINER LLP

By: */s/ Ellyn S. Garofalo*
Ellyn S. Garofalo
Attorneys for Plaintiff
WEBSPECTATOR CORPORATION,
a Delaware corporation

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b), Fed. R. Civ. P., Plaintiff hereby demands trial by jury as to all claims in this litigation.

Dated: May 24, 2017 LINER LLP

By: */s/ Ellyn S. Garofalo*
Ellyn S. Garofalo
Attorneys for Plaintiff
WEBSPECTATOR CORPORATION,
a Delaware corporation